UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HOWARD & | : | |
|   DONNA MAKUFKA | : | |
|     Plaintiffs, | : | 3:16-CV-00567 (VLB) |
| | : | |
| v. | : | |
| | : | |
| CSAA FIRE & CASUALTY INS. CO, | : | January 18, 2018 |
|     Defendant. | : | |

**MEMORANDUM OF DECISION GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.    Introduction**

Before the Court is Defendant CSAA Fire & Casualty Insurance Company's ("CSAA" or "Defendant") Motion FOR Summary Judgment as to all counts of the Complaint, which allege breach of contract (Count One), breach of the duty of good faith and fair dealing (Count Two), and violation of the Connecticut Unfair Trade Practices Act and the Connecticut Unfair Insurance Practices Act (Count Three) [Dkt. 34.]  Plaintiffs Howard and Donna Makufka ("Plaintiffs") oppose the Motion.  [Dkt. No. 39.].  For the reasons discussed below, Defendant's Motion is GRANTED.

**II.    Factual Background**

Plaintiffs purchased a home located at 23 Sandy Beach Road, Ellington, Connecticut (the "Premises") in 1991.  [Dkt. 35-6 (D. Makufka Dep. at 8.]  The Premises was built in 1985.  *Id.*  Defendant provided Plaintiffs a homeowner's insurance policy for the Premises on September 18, 2015 (the "Policy").  [Dkt. 35-4 (Policy) at 1].  The Policy excludes coverage for losses caused by "wear and tear, marring, deterioration . . . [m]echanical breakdown, latent defect,

1

inherent vice, or any quality in property that causes it to damage or destroy itself . . . settling, shrinking, bulging or expansion, including resultant cracking, of . . . foundations [or] walls." Policy at 21-23. The Policy also excludes coverage for "loss to property . . . caused by . . . [f]aulty, inadequate or defective . . . [m]aterials used in . . . construction." *Id*.

In addition, the Policy deletes a section providing coverage for "collapse" and replaces it with language defining collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." *Id*. The Policy explains that "[a] building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse, [a] part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building, [and a] building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." *Id*.

The Policy insures for "direct physical loss" caused by certain "perils insured against," including "[d]ecay that is hidden from view, unless the presence of such decay is known to an 'insured' prior to collapse . . . or [u]se of defective material or methods [i]n construction." *Id*. However, loss to a "foundation [due to a peril insured against] is not [covered] unless the loss

**2**

is a direct result of the collapse of a building or any part of a building." Policy at Ex. B, HW01060210 p.1 of 3.

The Policy also states Defendant will pay the "reasonable cost incurred by [the insured] for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage." *Id.* at 15.

Finally, the Policy "applies only to loss which occurs during the policy period" and an insured may only sue under the policy if "there has been full compliance with all of the terms under Section I of this policy and the action is started within two years after the date of loss." *Id.* at 35, 37.

Plaintiffs first noticed cracks in the Premises' basement walls around 2000. [Dkt. 35-5 (H. Makufka Dep.) at 26-27; D. Makufka Dep. at 17.] Plaintiff Howard Makufka first noticed the cracks expanding and "thought [they] had an issue" in 2014. H. Makufka Dep. at 34. Before that date, Mr. Makufka thought the "small cracks" were "just normal concrete cracking." *Id.* Mr. Makufka did not realize the cracks posed a "serious issue" until October of 2015 after consulting with a concrete mason. *Id.*

The concrete which forms the basement walls was made with "defective materials" which made the breakdown of the concrete "inevitable." [Dkt. 35-7 (Neal Dep.) at 48-49; Dkt. 35-10 (Centurelli Expert Report) (stating the cracks are the result of a defect in the concrete which has been present since the initial placement of the concrete).] Plaintiffs submitted a claim to Defendant for the

damage to their foundation listing the date of loss as October 1, 2015. [Dkt. 35-8 (McMillan Aff.) at 5.]

On December 8, 2015, Defendant denied Plaintiffs' claim, stating "settling or cracking of foundation walls or ceilings is specifically exclude[d] in your policy." *Id*. The letter refers to language in the Policy excluding coverage for "loss caused by settling, shrinking, bulging or expansion, including resultant cracking of . . . foundations [or] walls." *Id*. The letter also indicates that Defendant "expects that [Plaintiffs] will undertake all necessary repairs so as to protect the property from future damage." *Id*. Should Plaintiffs fail to do so, the letter warns that Defendant "cannot be held liable for any further damage to the dwelling." *Id*.

On February 22, 2016, William Neal, P.E., a consulting engineer, conducted a "visual examination" of the Premises' concrete foundation. [Dkt. 39-1 (Rule 56(a)(2) Statement), Ex. AA (Neal Letter) at 1.] He noted that the cracks in the concrete had "rapidly worsened in size and number in the last three months" and the foundation walls were "bowing inward" by half an inch. *Id*. Neal opined that "the most likely cause of the foundation distress is a chemical reaction resulting from incompatible materials used in the concrete mix." *Id*. He opined that there is "no way to arrest the process" of deterioration and concluded that the basement walls were "structurally unsound" and needed to be replaced. *Id*.

The Premises is still standing, is not in imminent danger of falling down, and Plaintiffs still live in the home. H. Makufka Dep. at 44-46; Neal Dep. at 37-38 (stating the house is still standing and while he cannot state the current condition

4

of the house since he has not visited the Premises recently, in February 2016 it was not in danger of caving in and was fit for human occupancy). No singular, sudden, or abrupt event caused the cracking. H. Makufka Dep. at 44; Neal Dep. at 36-38.

### III. Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted). In addition, the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.' At the

summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

    IV.    <u>Discussion</u>

        a.   <u>Count One: Breach of Contract</u>

An insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372–73 (2008). Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7–8 (2011) (quoting Remillard v. Remillard, 297 Conn. 345, 355 (2010)); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction." (internal quotations omitted)).

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe*, 300 Conn. at 260 (quoting

6

*Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 734–35 (2005)). A contract is unambiguous when "its language is clear and conveys a definite and precise intent . . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.*

Where the language of an insurance policy is ambiguous, such language must be construed against the insurance company that drafted the policy. *See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 806 (1999). However, any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so . . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Harbour Pointe*, 300 Conn. at 261 (quoting *Cantonbury Heights*, 273 Conn. at 735).

Defendant asserts the Policy does not allow coverage for Plaintiffs' loss, and accordingly argues there is no evidence to support their breach of contract claim. As discussed below, the Court agrees with the Defendant that the Policy's definition of "collapse" does not encompass Plaintiffs' loss. *Id.* at 2. In addition,

the Court agrees with Defendant that exclusions in the policy bar the coverage Plaintiffs seek. *Id.*

### i. The Policy's Definition of Collapse

The Policy is explicit in its definition of collapse: it is an "abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." Policy at 29-31. Other courts which have evaluated policies with such a definition have found them to unambiguously deny coverage for mere cracking of concrete. *See, e.g.*, *Lynne Liston-Smith v. CSAA Fire & Casualty Ins. Co.*, 3:16-cv-510 (JCH) (Dec. 15, 2017) (unpublished); *Alexander v. Gen. Ins. Co. of Am.*, No. 3:16-cv-059 at Dkt. 22 (transcript of ruling from the bench). In each of those cases, the insured structure had cracked concrete due to a chemical reaction but was still standing, and in each instance the court found the policy excluded coverage.

While the Court is sensitive to Plaintiffs' argument that they have been told their structure is structurally unsound, that allegation is insufficient given the explicit definition of "collapse" in the Policy, which excludes from the definition any structure "that is in danger of falling down or caving in." Policy at 29-31. Judge Underhill's explanation is particularly illustrative: "Let's use insect damage. There's termites in the house. No collapse. They're eating away; every day they're eating away. No collapse. They keep eating away. Finally, they eat enough that the beam falls. . . . Now there's coverage. Now you have a collapse or falling in." *Alexander*, No. 3:16-cv-059, Dkt. 22 at 14.

8

Plaintiffs' assertion that the Policy's definition of "collapse" is ambiguous is unavailing, as the precedent Plaintiffs cite in support is readily distinguishable. In *Dalton v. Harleysville Worcester Mutual*, 557 F.3d 88, 93 (2d Cir. 2009), the policy at issue covered "direct physical loss involving collapse of a building or any part of a building caused . . . by . . . hidden decay" but noted that "settling, cracking, shrinkage, bulging or expansion" did not constitute "collapse." *Id.* at 90. The Second Circuit found the policy ambiguous as to whether collapse required "total or near total destruction" of the building or whether "substantial impairment of the structural integrity" was sufficient. *Id.* However, the *Dalton* Court explicitly stated the policy would not have been ambiguous if it had "contained express definitional terms . . . for example, that a collapse was 'an abrupt falling down or caving in' and that 'a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking.'" *Id.* at n.1.

Here, "collapse" requires "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." *Id*. There is no question of fact that the Premises is still standing and lived in by Plaintiffs and has not abruptly fallen down or caved in. Accordingly, the Policy does not cover Plaintiffs' loss.

### ii. The Policy's Exclusions

Defendant also asserts Plaintiffs' loss is barred by multiple exclusions within the Policy, including exclusions for damage caused by deterioration, inherent vice, or latent defect; damage caused by faulty, inadequate or defective

9

materials used in construction; and damage caused by and/or consisting of bulging or cracking of a foundation or wall. Motion at 22-23.

Plaintiffs respond that their loss warrants coverage because loss due to chemical reactions is not explicitly listed among the exclusions to that coverage. Opposition at 10.

Judge Shea recently rejected Plaintiffs' argument, stating it "does not matter whether the originating event behind the cracking and deterioration was a chemical reaction; the exclusions in the Polic[y] make no exception for losses for which the cause is itself a product of a chemical reaction." *England v. Amica Mut. Ins. Co.*, 3:16-cv-1951, 2017 WL 3996394 (D. Conn. 2017)); *see also Agosti v. Merrimack Mut. Fire Ins. Co.*, 3:16-cv-1686, 2017 WL 3710786 (D. Conn. 2017) (stating claimants' "loss . . . clearly consists of settling, cracking, shrinking, bulging, or expansion of . . . foundations [or] walls . . . [and the] technical source of the cracking or bulging is irrelevant").

In *England*, as here, the plaintiff's insurance policy enumerated excluded losses such "faulty, inadequate or defective . . . materials used in . . . construction." 2017 WL 3996394 at *2-3. The Court rejected the theory that a chemical reaction itself is covered as a loss "independent of any of its manifestations," because "loss," although undefined in the policy, "unambiguously require[s] some change to the detriment of the insured, and a chemical reaction – without any physical manifestations – does not fit that bill." *Id*. The only "loss" suffered was the deterioration and cracking of the basement walls, which were specifically excluded under the policy. *Id*. at *8.

Here, the only loss about which Plaintiffs have offered evidence is the cracking of their concrete (due to a chemical reaction). That loss is explicitly excluded from coverage under the Policy.

Defendant also raises other arguments in favor of summary judgment, including that Plaintiffs did not timely initiate this suit and that the all-risk Policy precludes coverage for non-fortuitous losses even in the absence of a specific exclusion. Because the previously discussed issues are dispositive, the Court need not address these other arguments. Summary judgment on Plaintiffs' breach of contract claim is granted.

### a. Counts Two and Three: Bad Faith and CUTPA

In light of the dismissal of Plaintiffs' breach of contract claim, summary judgment is also granted as to Plaintiffs' bad faith and CUTPA claims, which are not viable absent a breach of the underlying contract. *See Capstone Building Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 798 (2013) (explaining that a claim for "bad faith is not actionable apart from a wrongful denial of a benefit under the [insurance] policy"); *Roberts v. Liberty Mut. Fire Ins. Co.*, 2017 WL 3710062, at *14 (D. Conn. Aug. 28, 2017) (finding that, as with a claim for breach of the implied covenant of good faith and fair dealing, "a claim for violation of CUTPA/CUIPA cannot succeed in the absence of a viable claim for breach of contract").

### V. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED as to all claims. This case is dismissed and the clerk is directed to close this file.

**IT IS SO ORDERED.**

                                                     /s/
                                       **Hon. Vanessa L. Bryant**
                                       **United States District Judge**

**Dated at Hartford, Connecticut: January 18, 2018**